**Lee A. TURZILLO et al.**

v.

**P & Z MERGENTIME, Appellant.**

**Lee A. TURZILLO et al., Appellants,**

v.

**P & Z MERGENTIME.**

Nos. 75–1079, 75–1080.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 19, 1976.

Decided April 8, 1976.

On Rehearing June 2, 1976.

Charles E. Townsend, Jr., San Francisco, Cal., of the bar of the Supreme Court of California pro hac vice by special leave of Court, with whom Edward F. McKie, Jr., Washington, D. C., was on the brief for appellant in No. 75–1079 and appellee in No. 75–1080.

Donald L. Otto, Cleveland, Ohio, with whom Donald D. Jeffery, Washington, D. C., was on the brief for appellees in No. 75–1079 and appellants in No. 75–1080.

Before McGOWAN and LEVENTHAL, Circuit Judges, and ALBERT V. BRYAN, Jr.,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

LEVENTHAL, Circuit Judge:

This is an appeal from an interlocutory judgment of the District Court holding two patents issued to plaintiff-appellee Lee A. Turzillo valid, and finding infringement by defendant-appellant P & Z Mergentime [1] with respect to the later issued patent. One is United States Patent No. 3,363,422 ('422 Patent), issued January 16, 1968, for a method and apparatus for anchoring a tie-down bar in an earth situs. The other is United States Patent No. 3,464,216 (the '216 Patent), issued September 2, 1969, for a method and means for forming cast-in-place reinforced concrete piles. On April 24, 1972, Lee A. Turzillo and Lee Turzillo Contracting Co., the licensee of the patents, filed a complaint charging P & Z Mergentime with infringement of claim 1 of the '422 patent and claims 1–6 of the '216 patent arising from the defendant's installation of tie backs at WMATA's operations center at 5th and G Streets, N.W., the National Gallery of Art (NGA), and the Union Station branch of the new District of Columbia subway system. Plaintiffs alleged that the '422 patent was infringed by defendant's continuous auger method, used principally at the operations center and NGA, and that the '216 patent was infringed by defendant's use of the sectional auger method, employed at Union Station.

On October 29, 1974, the trial court, sitting without a jury, issued a Memorandum Opinion, followed by a Judgment, filed November 25, 1974, declaring '422 valid as to claim 1 and '216 valid as to claims 1–6; and ruling that defendant had not infringed '422 but had infringed claims of 1–6 of '216 through its sectional auger method. The trial court enjoined further infringement, and referred the case to an auditor to determine damages.

## I. '422 PATENT

■ The District Court opinion is largely devoted to a discussion of the prior art and the validity of the '422 patent. We have doubts about the ruling that the '422 patent is valid but we simply vacate that ruling rather than resolve the issue of validity in this litigation since, in any event, we are satisfied that the findings by the judge concerning noninfringement were not clearly erroneous.

### A. The Patent

We begin by repeating, almost verbatim, the District Court's description of the patent—compiled with an acknowledgement that we doubt we could have understood it without the aid of the diagrams in the patents and briefs of counsel.

The '422 patent relates to a method and apparatus for anchoring a tie-down bar in an earth situs using a hollow-shafted auger or drill. The central passage of the drill is closed at its inner end by a driving bit, which is a unit separate from the drill. The driving bit consists of a cutting member, sometimes a flat, pointed piece of steel which assists in forming the hole; a base plate or closure plate which covers the lower end of the drill; and a cylinder portion which is attached to the back side of the plate. The cylinder portion may be square or round and may or may not be threaded. Its function is to accept a steel tendon or reinforcing bar. The bar, whose length will be the entire length of the hole to be formed, is welded or threaded to the base plate at its center and is inserted into the central passageway of the auger before drilling. After the bit with its reinforcing bar is loaded onto the drill, the bit is releasably connected to the shaft of the drill so that there is no relative motion between the drill shaft and the bit. The bit and the drill thus act as a unit in forming the hole. In the preferred form of plaintiff's invention, the driving bit is releasably retained at the inner end by a pin which is inserted through the reinforcing bar at the top of the drill and which spans the outer diameter of the drill so that it acts, simultaneously, as a

1. A joint venture company composed of P & Z Company, Inc., a California corporation, and Mergentime Corporation, a Delaware corporation.

drive to rotate the bit and a means to lock the driving bit to the inner end of the drill. In the field, however, Turzillo used other, equivalent means, such as wood shims, cloth, or a ball-spring detent device at the lower end of the drill to wedge the driving bit into the inner diameter of the shaft. Also commonly used by plaintiff to accomplish an equivalent releasable connection was ordinary bailing wire wrapped about the tip of the driving bit and an outer portion of the drill shaft. After drilling, the bit and tie-down bar are released from the drill. The bit then acts as an anchor for the bar while the drill is progressively removed from the hole and fluid cement is fed through the central passageway of the drill to form a concrete column.

The result of this method is a column of concrete surrounding a steel tendon which has been accurately centered within the column. Such tie backs are not the equivalent of the familiar concrete columns into which reinforcing bars have been inserted. By using steel of varying tensile strengths and by accurately centering the tendons, tie backs or tie-downs may be constructed which are used, among other uses, to hold back earth walls in excavation sites thus relieving the site of a great deal of clutter and allowing actual construction to proceed much faster, to hold buildings firmly down, or to keep buildings from sinking.

### B. *District Court's Rulings as to Prior Art*

The District Court examined the leading examples of prior art cited by defendant.[2] It noted that with the exception of Phares, the patent examiner had all this art before him, and concluded that it saw no reason to overturn his decision to issue a patent on claim 1 of '422.

The District Court's judgments as to these matters is fairly indicated by its discussion of the prior Patterson patent and Turzillo's improvement thereon, as follows:

Patent No. 2,729,067 to Patterson in 1956 showed the use of a drill to define a cavity in the earth and, in one embodiment, the use of a hollow shafted auger through which cement grout is passed is proposed. In this embodiment, grout pressure is used to drive the driving bit from the auger shaft.

Thus, as early as 1956, those in the trade had all the elements available to them to form tension piles in the manner of Turzillo '422. Yet, for one reason or another tension piles could not be formed efficiently using these known methods. The testimony of Mr. Turzillo and Mr. Liver, an officer of the Turzillo Company, showed that in the mid-sixties Intrusion Prepakt was still using the Patterson method of first forming the pile and then manually inserting the steel tendon into the formed pile. However, this method could not produce the desired results and in at least one tie back job done for the Gulf Power Company in Louisiana Intrusion Prepakt was replaced by Turzillo's company. Intrusion Prepakt now holds licenses under both the '422 and the '216 patents. Indeed, defendant's first attempt to construct tie backs under their [sic] contracts in Washington was to use the even older percussion method of driving pipes into the ground and manually inserting the reinforcing bar after drilling. This method, however, resulted in too many failures. Defendants then switched to the methods now accused of

---

**2.**  (1) U.S. Patent No. 1,805,265 to Taussig for a screw conveyor pile, published May 12, 1931, assigned to Raymond Concrete Pile Company of New York;

(2) U.S. Patent No. 2,146,645 to Newman for foundation construction, published February 7, 1939;

(3) U.S. Patent No. 2,729,067 to Patterson for a method for forming piles, published January 3, 1956, assigned to Intrusion Prepakt, Inc.;

(4) German printed application No. 1,104,905 to Bauer for a traction anchor for anchoring structures in the ground, published April 13, 1961;

(5) U.S. Patent No. 3,200,599 to Phares for apparatus for forming piles, published August 17, 1965, assigned to Raymond International, Inc.;

(6) U.S. Patent No. 3,228,200 to Dufresne for a method of forming concrete piles, published January 11, 1966.

infringement and thereafter had no test failures after the pile was formed. (J.A. 11–12).

As to such findings we see no reason for appellate intervention. A different question arises, however, in connection with the Phares patent. It was not called to the attention of the patent examiner. It was published August 17, 1965, after the filing of Turzillo's application on March 19, 1965, but well before the issuance of the '422 patent on January 16, 1968. The District Court rejected defendant's contention that the '422 patent should be held invalid because of the applicant's failure to cite Phares to the patent office during prosecution of the application. It stated:

> Defendant cites *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555 (5th Cir. 1970); *Monsanto Co. v. Rohn & Haas, Inc.*, 456 F.2d 592 (3d Cir. 1972); *Carter-Wallace v. Davis-Edwards Corp.*, 443 F.2d 867 (2d Cir. 1971); and *Norton v. Curtiss*, 433 F.2d 779, 57 CCPA 1384 (1970), in support of its position. None of these cases stand for the proposition that the mere failure to cite a reference, without more, is grounds for invalidating a patent. To be sure an applicant has a high duty to inform the Patent Office of all pertinent facts affecting the prosecution of his application. But the examiner in his initial search, searched the subclass in which Phares was classified and cited the Dufresne and Newman references from that subclass as prior art.[2] At this point, as is discussed below, the examiner had all of the most pertinent art before him. Assuming Turzillo actually knew of the Phares at this time, he could as well been of the opinion that Phares was not pertinent to his invention. Defendant has made no showing, and has not attempted to show, the wilful nature of plaintiffs' failure or a recognition or admission on the plaintiffs' part that Phares should have been brought to the examiner's attention. Moreover, Phares is not a 102 reference,[3] as was the case in *Beckman*, and does not completely negate the '422 claims. On the basis of the record before the court, the court rejects defendant's contention. However, to the extent that the presumption of validity is affected by the possibility that the examiner did not have Phares before him, the court will more closely examine '422 against the prior art including Phares.
>
> [2] The examiner did cite Phares during the prosecution of the related '216 application. However, Phares was cited there merely in passing as an exemplar of pertinent art and never expressly relied upon during the prosecution by the examiner.
>
> [3] 35 U.S.C. 102.

(J.A. 9–10).

As appears from the foregoing, the District Court indicated that it would closely examine '422 in view of the failure to disclose the Phares patent. However, when it came to examining the significance of Phares, its analysis consisted of the following:

> Finally, the Phares device, as disclosed in Figures 22–24 of the specification is an attempt to combine all the known elements to form a tension pile with steel tendons centrally located within the pile. However, the Phares device is significantly more complex than that of Turzillo, as a comparison of the disclosure of Turzillo with that of Phares, Figures 22–24 and accompanying text, will illustrate.
>
> The examiner had before him all the art cited above with the exception of Phares and in the face of these references issued claim one of '422. The court sees no reason to overturn his decision. The installation of tension pile or tie backs is a relatively new field. If a new combination and arrangement of known elements produces a new and beneficial result, never attained before, it is evidence of invention. *Maschinenfabrik Rieter A.G. v. Greenwood Mills*, 340 F.Supp. 1103 (D.S.C.1971). None of the cited references completely anticipates plaintiffs' claimed invention. In determining obviousness under 35 U.S.C. § 103 hindsight reconstruction of the prior art after the invention's commercial acceptance is not the applicable standard. *Id.; Simplicity Mfg.*

*Co. v. Quick Mfg. Co.*, 355 F.2d 1012 (6th Cir. 1966). The development of the prior art in this case and the responses of those laboring in the field to make the same invention, as illustrated by the patent to Phares, a recognized leader in the field, indicate that Turzillo's method and device eliminated a technological block in the practical implementation of the prior art. This itself is strongly supportive of the lack of obviousness.

With respect to the Phares patent and the validity of claim 1 in view of its disclosure, the court believes claim 1 of '422 to be patently distinct from Phares. Phares does not show a driving bit which *closes* the inner end of the hollow shaft. The Phares bit is held onto the inner end of the auger shaft but the closure plate, element no. 145 actually *closes* the inner end not the driving bit. In addition, Phares does not show releasing the driving bit and the steel tendon attached thereto in substantially centered position within the hole. Defendant failed to show how these distinctions are but obvious improvements over Phares. Its one technical witness had no experience with tie backs before joining defendant's company in Washington. In addition, the testimony of one of plaintiff's witnesses, Mr. Marshall, indicates that the experimental prototype for the Figure 22 embodiment of Phares was unworkable. It is also unrefuted in the record that the Phares device has never been successfully used commercially in the United States. It appears to the court that Phares is no better than the art considered and rejected by the Patent Office and, therefore, would not have changed the Examiner's decision with respect to claim 1 of '422.

Since a patent is presumed to be valid, 35 U.S.C. § 282, and since the defendant failed in its burden of establishing inval- idity, the court holds that claim 1 of '422 is valid.

(J.A. 12–14).

### C. *Problems Arising out of Phares Patent*

An appellate court is diffident in injecting itself into issues that turn on perception of the facts. But we must voice our concern over the way in which the District Judge handled the matter of the Phares patent. We are not particularly troubled by his mistake in saying that Phares does not show release of the driving bit in substantially centered position. Plaintiffs' brief posits that this was a slip of the pen and that the trial court said "driving bit" when he meant to say "valve plate." More importantly, the District Court has not clearly grappled with the significance of the disclosure in Phares as anticipating at least major elements of Turzillo.

Certainly Phares resembles Turzillo in presenting (a) a hollow auger, that is (b) closed by a driving bit and valve plate while the drilling is under way (to prevent the earth from coming back through the auger), and includes (c) a central reinforcing rod.

There are distinctions between the Phares patent and Turzillo's. Phares proposes three rods, all within the auger; Turzillo, one rod. More important, Phares was so constructed that the valve plate could be withdrawn, and not left in the hole. While the matter is not entirely clear from the Phares patent, the withdrawal of the valve plate is presumably related to the use by Phares of a pressure sensing system to measure the pressure of the cement grout in the lower region of the drill so that the rate of withdrawal of the drill may be correlated with the rate of flow of the grout. Phares Patent, columns 15–16 (J.A. 394). There is little doubt that, as the trial judge found, Phares is more complex than Turzillo. It tried to do more things. As the trial judge noted, Turzillo showed distinctions from Phares,[3] but the judge did

---

3. At oral argument in this court, plaintiffs stressed that Phares' valve plate is a separate element from the drill bit, and held in place by pins and posts, whereas Turzillo shows the valve plate welded to the bit; and that Phares' drill bit does not perform the valving function, whereas Turzillo shows the bit to have a dual function of both drilling the hole and providing a closure (to prevent the dirt from coming up the hollow shaft of the auger).

not articulate whether, and in what respect, those distinctions were material. Nor do we discern wherein he grappled with the question of whether, if one takes the method disclosed by Phares' patent as a beginning, any differences by Turzillo—accepting them as simplifications and advances—were obvious vel non. Since the Phares patent was not before the examiner, this is a matter which should have been specifically explored by the judge.

█ We are aware that the District Judge said that because Phares was not before the examiner he "will more closely examine '422 against the prior art including Phares." However, the examination actually undertaken was cursory. And the court's concluding paragraph restates the statutory presumption of validity and finds '422 valid "since the defendant failed in its burden of establishing invalidity" (J.A. 14). We discern overall a continuing presumption accorded to the patent which was error insofar as it applied to Phares. The statutory presumption of validity does not apply to prior art not cited to the Patent Office,[4] and even one prior art reference not cited to the examiner overcomes the presumption.[5]

D. *Issue of Non-disclosure of Phares Patent*

On the issue of non-disclosure of the Phares patent to the examiner, the judge put it that assuming Turzillo knew of Phares "he could [have] been of the opinion that Phares was not pertinent to his invention." The trial judge also notes that

Phares "does not completely negate the '422 claims."

█ Obviously, duty to disclose to the patent office arises for matters that are relevant even though the applicant feels they do not establish anticipation. Indeed any disclosure would be routinely coupled with an explanation as to why it does not constitute anticipation. The duty of disclosure to the patent office is enhanced by the consequence that issuance of a patent by the patent office is accorded a presumption of validity, even though the proceeding before the patent office is not adversary and is dependent upon examination by an official who may not equal in resources those who are in the field commercially, and who does not have the extra spark of an economic incentive to avoid the tribute or other restraint that may be exacted by a patentee.[6] Thus, the applicant for a patent owes "the highest degree of candor and good faith" to the Patent Office, *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123, 126 (1949), "an uncompromising duty to report to [the Patent Office] all facts concerning possible fraud or inequitableness underlying the applications in issue," *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381, 1388 (1945).

Plaintiffs' counsel insists that there is no showing that Turzillo knew of Phares. He concedes that there is a showing that Turzillo's patent counsel was advised of the Phares patent. *See* J.A. 284. But he claims that this was not enough to consti-

4. *See, e. g., AR Inc. v. Electro Voice, Inc.*, 311 F.2d 508, 512–13 (7th Cir. 1962); *Hobbs v. Wisconsin Power & Light Co.*, 250 F.2d 100, 105 (7th Cir. 1957), *cert. denied*, 356 U.S. 932; 78 S.Ct. 774, 2 L.Ed.2d 762 (1958); *Royal Patent Corp. v. Monarch Tool & Mfg. Co.*, 203 F.2d 299, 300 (6th Cir. 1953).

5. *See, e. g., Simmons Co. v. Hill-Rom Co.*, 352 F.2d 886, 888 (7th Cir. 1965).

6. The ex parte prosecution and examination of a patent application must not be considered as an adversary proceeding and should not be limited to the standards required in inter partes proceedings. With the seemingly ever-increasing number of applications be-

fore it, the Patent Office has a tremendous burden. While being a fact-finding as well as an adjudicatory agency, it is necessarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. In addition, it has no testing facilities of its own. Clearly, it must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system.

*Norton v. Curtiss*, 433 F.2d 779, 793–94, 57 CCPA 1384 (1970).

tute evidence that Turzillo's patent counsel knew of the significance of the Phares patent. Appellant's counsel replies that it is manifest that Turzillo's patent counsel, prosecuting an application described as a "method and apparatus for anchoring a tie-down bar in an earth situs," would have been aware of at least the potential importance of the issuance of Phares patent, described as "method for forming piles in situ."

■ We are aware of the considerable body of authority holding that mere negligent omission or misstatement before the Patent Office in the absence of a showing of intentional fraud or willfulness does not amount to the "unclean hands" which would bar enforcement of an otherwise valid patent,[7] although there are indications that a patent applicant may breach his affirmative duty of disclosure by negligence so extreme as to be described as recklessness or gross negligence but falling short of deliberate intent to deceive the examiner.[8] However, we are not required at this juncture to formulate what standard for nondisclosure of pertinent prior art bars enforcement of an otherwise valid patent. Even assuming the stricter willfulness standard

obtains, we are not satisfied with the District Court's consideration. The District Judge assumed, for purpose of discussion, that Turzillo knew of Phares. But his approach was permeated by his cursory dismissal of the pertinency of Phares to Turzillo's claim in '422. And so there was no development of a complete record on how it came about that Phares was not brought to the attention of the examiner.

### E. *Appellate Disposition*

■ In the foregoing context, this court concludes it will vacate that part of the trial judge's decree which declares that the Turzillo patent '422 is valid. We are not holding the '422 patent invalid. But the problems we have identified as to the Phares patent—of anticipation of Turzillo, and of Turzillo's failure to disclose—are sufficiently troubling that we would not wish to affirm the declaration of validity on this record. Instead we leave that question open, as we may properly do in view of our affirmance of the judgment that the defendant has not infringed '422 (even assuming validity). The issues concerning infringement are more factual and straightforward than those concerning validity, and we do not see any error in the trial court's handling of this matter.[9]

---

**7.** *See, e. g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247, 251 (1965) (willful misrepresentation required to strip patentee of its exemption from the antitrust laws); *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809, 819 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970) (same); *Tractor Supply Co. v. International Harvester Co.*, 155 U.S.P.Q. 420, 433 (N.D.Ill. 1967) (innocent misrepresentation without proof of intention or willfulness does not work forfeiture of patentee's rights).

**8.** *See Norton v. Curtiss*, 433 F.2d 779, 796, 57 CCPA 1384 (1970) ("Where public policy demands a complete and accurate disclosure it may suffice to show nothing more than the misrepresentations were made in an atmosphere of gross negligence as to their truth."); *cf. Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 599–600 (3d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972) (failure to disclose inconsistent representations made in prior applications "amounted to misrepresentation transgressing equitable standards of conduct owed the public"); *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963,

968–69 (S.D.N.Y.1971) ("recklessness indicating a disregard for [patentee's] duty of frankness" may bar enforcement of patent); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198, 1204–05 (7th Cir. 1970), *cert. denied*, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971) (deliberate misrepresentation required except possibly where non-disclosed prior art is almost identical with the patentee's invention).

**9.** The trial judge found that in actual operation defendant's drill bit was not attached to the auger shaft, that defendant was satisfied with the loosely fitting bit to close the inner end of the shaft, which hopefully would fall off after drilling was complete, and that during drilling the bit was to be held onto the auger pin by downcrowding the bit against the shaft. Plaintiffs urge that the fact that defendant used bailing wire to keep bit and shaft together provided the "releasable connection" called for by the claim. The court found that the defendant used the wire not to form such a connection but rather to hold the two elements together *before* drilling, and the wire was expected to break off immediately after drilling commenced.

## II. '216 PATENT

Having discussed the '422 patent and the prior art at some length, the trial judge disposed of the issue of validity of the '216 patent in somewhat summary fashion, finding it an improvement over the '422 patent and valid in light of his earlier discussion of the prior art. In the '216 patent, the claims do not contemplate a rod that is in the auger shaft while drilling takes place. Instead the rod is inserted after drilling is concluded. In the first instance, its function is to drive off by ramming force the bit from the inner end of the shaft, which permits the auger to be withdrawn (without the bit) and cement to be introduced into the hole. Ultimately it becomes a reinforcing rod set in the cement.

With all respect, this summary treatment by the trial judge did not face up to the problem of this case. The '422 patent, regardless of its validity, was in the public domain, and it was incumbent on Turzillo to show that '216 marked a non-obvious advance over all prior art, including '422. The patentability of '216 is independent of the patentability of '422. That is, '216 may represent a non-obvious and patentable advance even though '422 was anticipated. Contrariwise '216 may be a modification that is obvious even though '422 was a valid patent, and if so the '216 patent is invalid, for Turzillo cannot receive two patents for what is in reality a single advance. The claim of patentable advance ("improvement") over '422 was particularly suspect here, because '216 rests on a different premise from '422. What '422 presented as an advance was the use of a reinforcing rod and drill bit as a unitary member placed in the auger shaft during drilling. What '216 presents is a reinforcing rod physically divorced from the drill bit, and used as a means of disengaging the closure after drilling.

We shall discuss presently whether '216 marked a non-obvious advance. We first pause to note that to some extent defendant also attacked the validity of the '216 patent in terms of lack of disclosure to the patent office. By this time, the examiner had become aware of Phares. But now, argues defendant, Turzillo failed to disclose that in the early 1950's in connection with a grout pipe situated alongside the drilling hole, he had used a rigid reinforcing rod to forcibly release a closure member from the bottom end of the passageway of the grout pipe (a closure needed to prevent earth from coming up and filling the passageway). Defendant contends that this "public use" resolved the problem of post-drilling release of the closure member and should have been disclosed to the examiner. Plaintiffs respond that there was no duty to disclose this because the use of a rod to knock out the plug of the grout tube is not in the same domain as dropping the rod down the auger shaft to dislodge the drill bit. We need not dwell on the significance of this purported non-disclosure, because we find the '216 patent invalid on the ground of obviousness.

The concept of using a rod to knock out the closure of the grout tube was in the public domain, as plaintiffs concede, and there is nothing of patentable dimension in the change from one grout tube (alongside the drilling hole) to another (the hollow shaft of the auger which had just been devoted to drilling),[10] or in the change from one closure of the grout tube (the plug) to another (the bit). As for leaving the rod in the tube as a reinforcement, that is obvious from the '422 patent, where the rod that had just been in contact with the bit was left in as reinforcement after contact with

Plaintiffs conducted tests to show that the wire did not break off, but these were ex parte. Plaintiffs did not show that conditions were the same as at the Washington, D.C. work site, and the trial judge properly gave the tests little weight.

The court also found that defendant's rigid element (steel cable) was not axially centered within the auger shaft, as called for by '422 claim, but was welded to the side of the cylinder portion of the driving bit.

10. Plaintiffs' concede that the prior art, particularly the second embodiment of the Patterson patent, discloses insertion of the grout through a hollow auger shaft (rather than a separate grout tube).

the bit had ended. And certainly everything in the '422 patent is fully disclosed to the public, for purposes of considering whether a later disclosure (in '216) represents a non-obvious advance, regardless of whether the '422 patent itself is valid. While a combination of previously known elements may sometimes be non-obvious, that is plainly not the case before us.

In some cases a matter like this is best remanded to the District Court, so that it can exercise its judgment on the facts in the light of its exposure over days of trial, but in the present case the foregoing conclusion is so clear that we think that an initial appellate disposition is in the interest of sound administration of justice, see 28 U.S.C. § 2108.

The judgment holding patent 3,363,422 valid is vacated, and the Judgment holding it not infringed by defendant is affirmed. The Judgment holding patent 3,264,216 valid is reversed.

*So ordered.*

### ORDER

PER CURIAM.

On consideration of the petition for rehearing filed by plaintiffs Turzillo, it is

ORDERED by the Court that the aforesaid petition for rehearing is granted to the extent indicated in the supplemental opinion issued this date, and is otherwise denied.

Opinion filed by Circuit Judge LEVENTHAL on Petition for Rehearing.

### OPINION ON REHEARING

LEVENTHAL, Circuit Judge:

█ Plaintiffs call to our attention that the '422 patent was not prior art as to the '216 patent because the applications for these patents were in a state of co-pendency for a period of 8 days (from January 8, 1968, until January 16, 1968). The law is settled that "copending applications on which patents are granted to the same inventor must pass two tests of validity. They must constitute invention over the prior art, and they must be 'different' from each other in order to avoid double patenting." *Weatherhead Company v. Drillmaster Supply Co.,* 227 F.2d 98, 101 (7th Cir. 1955).

█ On the second of these inquiries, "[c]o-pending applications are not prior art as to each other; but this means only that when the applications are made by the same inventor and the doctrine of double patenting applies, the later patent need not show an inventive advance over what was disclosed but not claimed in the earlier patent and when determining whether double-patenting exists, only the claims are compared and the claim of the patent must show an invention beyond the claims of the first." 1 Deller's Walker on Patents § 62, at 306 (2d ed. 1964). On April 21, 1976, after the judgment of this court issued, petitioner Turzillo moved to avoid double patenting difficulties by filing a terminal disclaimer for the remaining life of the '216 patent after January 16, 1985, the expiration date of the '422 patent.

█ Double patenting was not at issue in this case. The District Judge characterized the '216 patent as "an improvement" over the '422 patent. Our opinion makes clear that the two patents rest on different premises. What our opinion deals with is the initial inquiry as to whether the '216 patent marked a nonobvious advance over the pertinent prior art. For this purpose, we believe there is some latitude for looking at the claims, as opposed to the unclaimed disclosures, of the '422 patent.

However, to avoid any misunderstanding as to the relationship between the two patents, we have given reconsideration to this case without recourse to either the disclosures or claims of the '422 patent. We relied on claim 1 of the '422 patent as to the use of a rigid rod as a reinforcement to be anchoringly embedded in a column of cementitious material.[1] This reliance was un-

---

1. Plaintiffs' petition points out that we misstate the teaching of the '422 patent in suggesting that "the rod that had just been in contact with the bit was left in as reinforcement after contact with the bit had ended." (at —— of 174 U.S.App.D.C., at 1401–1402 of 532 F.2d). This was an inadvertence. We intended "drill" when we said "bit."

necessary. The location of reinforcing members in a concrete pile is a feature of the conventional "percussion method," as illustrated by the Newman patent—a teaching that is old in the art. With that modification, our original opinion demonstrates the lack of requisite invention in the '216 patent.[2]

Plaintiffs put it that a holding of obviousness by this court can only be based upon improper hindsight reconstruction of the prior art. All we can say is that we tried to be aware of the problem and to avoid the vice. "[T]he mere existence of differences between the prior art and an invention does not establish the invention's nonobviousness. The gap between the prior art and [plaintiffs'] system is simply not so great as to render the system nonobvious to one reasonably skilled in the art." *Dann v. Johnston,* —— U.S. ——, ——, 96 S.Ct. 1393, 1399, 47 L.Ed.2d 692, 700, 44 U.S.L.W. 4463, 4466 (1976). Ultimately, as was reinforced by the Supreme Court's most recent patent opinion, *Sakraida v. Ag Pro, Inc.,* —— U.S. ——, ——, 96 S.Ct. 1532, 1536–37, 47 L.Ed.2d 784, 790–91, 44 U.S.L.W. 4477, 4480 (1976), a court must exercise its judgment on this question of law, and is not controlled by commercial success or acceptance.

2. Plaintiffs' petition states that the claims of the '216 patent recite many limitations not considered by this court. These were not briefed or argued as demonstrating nonobvious advances.